Filed 6/27/25  In re Davion J. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DAVION J. et al., Persons Coming Under the Juvenile Court Law. | B341812 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>D.J., Sr.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP03434A-B) |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Commissioner.  Affirmed.

California Appellate Project, Richard B. Lennon, and Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel for Plaintiff and Respondent.

———————————————

Davion J., Sr. (father) and P.L. (mother) have three children together:  Davion J. (born in February 2016), Amor J. (born in July 2017), and J.J.[1] (born in October 2018).  Father appeals from orders (1) denying his Welfare and Institutions Code[2] section 388 petition as to Davion and Amor, and (2) terminating parental rights to Amor.  Father contends the juvenile court erred by entering both orders because he demonstrated changed circumstances and that the requested change of orders was in the children's best interests.  We find no error, and thus we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.    Detention and petition.

Mother, father, two-year-old Davion, and 10-month-old Amor came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in May 2018 after mother and father were arrested for selling cocaine in the children's presence.  DCFS detained Davion and Amor and placed them in foster care.

---

[1]    J.J. is not at issue in this appeal.

[2]    All subsequent statutory references are to the Welfare and Institutions Code.

In September 2018, the juvenile court found the children were juvenile court dependents because the parents had possessed and sold cocaine in the children's presence. The court removed the children from the parents and ordered father to drug test weekly, take a parenting class, and participate in individual counseling. Father was permitted eight hours of monitored visits weekly.

Mother gave birth to J.J. in October 2018. J.J. was detained and placed with his siblings.

## II. Six- and 12-month review (March and June 2019).

DCFS reported in February 2019 that father had completed his parenting classes, but he had not drug tested or enrolled in individual counseling. At the six-month review hearing in March 2019, the court found that the parents were in partial compliance with their case plans, and it ordered an additional six months of reunification services. The court advised the parents that if they missed any further drug tests or tested positive for drugs, they would be ordered to complete full drug programs.

Father missed several drug tests and tested positive for marijuana in March and April 2019. He did not enroll in individual counseling or a drug program. The parents visited the children regularly, but the children did not appear bonded to them. At the 12-month review hearing in June 2019, the court found that father was in partial compliance with the case plan and continued reunification services for another six months.

## III. 18-month review (February 2020).

In June 2019, the caregiver reported that Davion's and Amor's behaviors were worsening. Both children were very

hyperactive and fought often, and Davion was engaging in self-harming behaviors. Further, both children exhibited some developmental delays. Three-year-old Davion had a vocabulary of fewer than 30 words and expressed himself in simple statements of one or two words. He ate with his fingers, had difficulty socializing with other children, and threw tantrums. Amor exhibited communicative, cognitive, and social/emotional delays.

DCFS reported in November 2019 that father had enrolled in drug rehabilitation programs several times but did not attend consistently. He missed most of his drug tests between June 2019 and February 2020 and tested positive for marijuana in November 2019. Father and mother visited the children frequently, but DCFS reported that the quality of the visits was lacking and the children did not appear bonded to the parents.

In February 2020, the juvenile court terminated reunification services and set a section 366.26 hearing for June 2020.

## IV. Initial period following termination of reunification services: 2020 through 2022.

The section 366.26 hearing was continued many times due to the Covid-19 pandemic. In August 2020, DCFS reported that both Davion and Amor were aggressive at daycare, Davion had hit other children, and Amor was expressing a lot of anger. All three children had been receiving therapy, but they stopped receiving those services at the beginning of the pandemic. In-person visits also were stopped at the beginning of the pandemic, and the parents did not consistently call the children.

In September 2020, several relatives contacted DCFS to express interest in legal guardianship of the children. In March

4

2021, all three children were moved to the home of their paternal great-aunt.

In May 2021, DCFS reported that the children had difficulty adjusting to their aunt's home and were acting out and hurting themselves and each other. Amor displayed sexualized behaviors and inappropriately touched their aunt's 10-year-old nephew. In May and June 2021, the aunt asked that Davion and Amor be removed from her home; subsequently, J.J. was also removed.

Both Davion and Amor were re-placed several times in 2021. Davion hit and bit children, was defiant and aggressive, and had trouble following directions. Amor threw tantrums and had emotional outbursts daily, kicked doors and furniture, peeled paint off the walls, pulled out her hair and braids, hit herself, bit her arms, and displayed sexualized behaviors. She reportedly was "hypervigilant" and awake during much of the night. J.J. exhibited speech and language delays, was aggressive with another child in the home, had trouble sleeping through the night, and engaged in self-harm. All three children were receiving services to address trauma, regulate their behavior, and improve their social skills.

In January 2022, DCFS reported that father continued to visit the children, and while the children were comfortable in his presence, they did not appear upset when visits ended. Father attempted to discipline the children, but he often appeared overwhelmed by their behavior. All three children displayed more challenging behaviors after visits with father. In January 2022, at DCFS's request, the juvenile court limited father's visits to once a month.

Davion and Amor had a visit with father and paternal family members in March 2022.  After the visit, Davion's caregiver reported that Davion regressed and that father called the caregiver and threatened her.  Amor's caregiver also reported receiving a threatening text message from father.  Father denied contacting either caregiver.  In April 2022, the court ordered father not to contact the caregivers and not to bring anyone with him to visits.

As of July 2022, the children were in three separate placements:  Davion with Danielle D., Amor with Virginia T., and J.J. with maternal cousins Latasha and James L. (the L.'s).  Davion had been diagnosed with autism, post-traumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD), and he was receiving psychiatric medication to help control his aggressive behavior.  Davion's anti-social behaviors had improved, but he was continuing to exhibit inappropriately sexualized behavior and toileting issues.  Amor was enrolled in an intensive treatment program and was working on decreasing self-harm and tantrums and on playing appropriately with peers.

Father had monitored visits with the children in August and September 2022.  He was loving and attentive to the children, but DCFS believed it would be challenging for father to handle the children for longer periods of time and without assistance.

In November 2022, DCFS reported that J.J.'s caregivers, with whom he had lived for more than a year, wished to adopt him.  In January 2023, parental rights to J.J. were terminated with a plan of adoption by the L.'s.

Amor continued to have tantrums frequently, and to hit, kick, and bite her caregiver, Virginia T., during tantrums.  In

September 2022, Virginia T. asked that Amor be removed from her home. Amor was re-placed with Delaina S. and her mother, Patricia B., in December 2022.

## V. Subsequent period following termination of reunification services: 2023 through 2024.

### A. Amor.

In May 2023, Amor was diagnosed with fetal alcohol spectrum disorder (FASD), microcephaly as a result of in utero alcohol exposure, and ADHD. DCFS reported that Amor exhibited deficits in self-regulation, social skills, and learning due to prenatal alcohol exposure and a history of trauma. In July 2023, the FASD clinic where Amor was being evaluated reported that it was "encouraged by the improvements [Amor] has [made] in the care of current foster family, who are providing the structure, support, and patient caregiving that she desperately needs."

DCFS reported in February 2024 that Amor was thriving in the home of her caregivers. While Amor continued to "have a lot of energy," got into some physical altercations with other kids at school, and was continuing to have difficulty learning to read, she was attending school regularly and participating in church activities, gymnastics, and karate. Her caregiver observed that Amor misbehaved when visits with her siblings or father were approaching.

In April 2024, DCFS reported that Amor's caregiver, Delaina S., wished to adopt her. DCFS reported "a positive bond as evidenced by the child referring to [Delaina S.] as 'Mommy' and will often look to her for comfort and affection. Amor has been observed by [the CSW] informing [Delaina S.] 'I ain't going

7

anywhere! I'm going to be here forever!' In addition, [Delaina S.], along with her mother, [Patricia B.], have fostered and adopted children for years and have vast knowledge [of] children with special needs."

In August 2024, DCFS reported that father generally did not call Amor between visits. Amor "does not express any sadness, breakdown or regression following father's visits. Amor does not ever mention her father until she is told that she is going on a visit. . . . [¶] Amor views father as more of a playmate rather than a parent, as playing is all that she does with father during a visit. [Delaina S.] reports that when visits do not occur, Amor does not ask about visits or ask when another visit will happen. Amor does not notice when visits do not occur. . . . [Delaina S.] reports that loss of contact with her birth parents has not caused emotional instability, preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Furthermore, it was actually the opposite that was occurring and a part of the reason why visits were paused. Amor had started acting out at school prior to and after visits. At home, Amor is fine. However, prior to a visit, Ms. S. would let Amor know in the morning that after school she was going to be picked up and have a visit. Amor would then act out at school. Pausing the visits reduced Amor's acting out at school."

### B. Davion.

DCFS reported significant concerns about Davion's foster mother, Danielle D., in January 2023, and in February 2024, the court ordered Davion moved to the home of J.J.'s prospective adoptive parents, Latasha and James L. Davion struggled to adjust to the structure and academic demands of the new placement, telling the social worker that he wanted to be moved

because " 'I don't want to read. . . . I don't want to write. . . I just want to watch YouTube and play. . . . I don't want to learn.' " In April 2024, he disclosed that he had planned to tell his attorney that Latasha had touched him inappropriately so he would be returned to his prior placement. He told his social worker: " 'I just wanted to get [Latasha] in trouble . . . so I can leave . . . . [S]he makes me read. . . . I want to go back with Ms. D. . . . [S]he let me watch YouTube.' " Davion said he felt happy and safe with the L.'s, but the L.'s made him read and do his schoolwork, while his prior foster mother had done his homework for him.

In May 2024, Davion told a social worker that Latasha had hit him. Later that day, Davion admitted that he had made up the incident because he didn't want to get in trouble for not having done his homework. Davion told the CSW that he " 'can't stop lying . . . I don't know why.' " Davion continued to pick on his brother and to say that he did not want J.J. to live in the home with him. The L.'s reported feeling overwhelmed and defeated. Davion reportedly was "engag[ing] in lying/dishonest behavior 100x per day. Per caregiver, [Davion] will lie about playing when he's supposed to be in time out, will lie about hitting sibling, and will blame others for his problems."

As of July 2024, Davion had been diagnosed with FASD and ADHD. He was receiving services "due to physical aggression (i.e., hitting, kicking, throwing toys), challenges with following directives, tantrums, and challenges with cooperative play (i.e. physical boundaries, challenges sharing, and snatching items from others), self-harm (banging head, scratching arm), and sexualized behavior (i.e., self-masturbation)." Therapists were working with him to address "[a]djustment disorder with

9

anxious mood, [s]elf-harm behavior management, [p]hysical aggression and [j]uvenile masturbation."

### C. Visits between father and the children.

Father had monthly visits with the children throughout most of 2023. DCFS reported that visits went well and father tried to engage all three children, but some intervention by the social workers was required.

In January 2024, the court increased father's visits to two times per month, two hours per visit. DCFS reported that Davion and Amor enjoyed visits with father and often had difficulty saying goodbye to him and to each other.

In May 2024, DCFS reported that although the L.'s had opened their home to father and given him their contact information, father did not call to check on the children or maintain contact with the L.'s. DCFS said: "The father does not call in-between visits to inquire about the children's well-being. After father visited the home of Mr. and Mrs. L., father made no further contact with the family. Caregivers Mr. and Mrs. L. have tried to facilitate visits and calls with the father; however, to no avail due to father either stating that he misplaced his phone or . . . not responding at all. Amor's caregiver Ms. S. reports the same. Ms. S. reports not having received any calls from Father to facilitate a call with Amor for months now."

Father's visits were paused for May 2024 because Davion and Amor were displaying behavioral concerns that threatened their placements. In August 2024, DCFS reported that Davion told his caregivers and CSW that father " 'doesn't care about me . . . he never calls. . .' "

## VI. Father's section 388 petition and termination of parental rights.

### A. Petition and responses.

Father filed a section 388 request to change court orders as to Amor and Davion in August 2024, requesting that his family reunification services be reinstated, the children be returned to his care, or he be granted unmonitored visitation. Father asserted that circumstances had changed because:

—He completed a parenting class through Project Fatherhood in May 2023, and a parenting orientation through DCFS in October 2023. In March and April 2024, he completed courses on fetal alcohol disorder and autism in toddler and preschool age children.

—He participated in an outpatient drug and alcohol treatment program from November 2022 through February 2023, and tested negative for all drugs other than marijuana between October 2023 and March 2024. He stopped smoking marijuana in April 2024, and tested negative for all substances in June 2024.

—He had a job and housing, and he was seeking a larger apartment that would accommodate him and the children.

—He had visited his children regularly from November 2022 through April 2024.

Father asserted that the proposed change of order was in the children's best interests because they "have a significant bond with me & complain that the monitored visits are too short or infrequent. They ask me if they can come over to my home. I am in a position where I can provide a home & ensure they have ongoing services to meet their educational & emotional needs." Father said that during visits, he played with the children, helped them with their homework, and read them age-

appropriate books. Additionally, he asserted that although Davion and Amor reportedly displayed behavioral problems in their placements, neither had ever displayed such issues during visits with him.

Father said that he had been trying to contact Davion for the past two months, but Davion's caregiver only allowed him to speak to Davion for 30 seconds. He last contacted Davion's caregiver by phone and text in late June 2024, but he had not received a response. Father said he had also tried to contact Amor through her caregiver, but his calls were not answered and he did not get a call back. Further, father said he had witnessed Ms. L. yelling at Davion and Mr. L. smoking marijuana.

Both DCFS and the children's counsel opposed father's request for change of court orders. The children's counsel noted that Davion had been in six placements, and Amor in four placements; father's failure to complete his case plan caused the need for multiple placements and created the trauma that was the genesis of the children's severe emotional and behavioral issues; Davion had ADHD and cognitive and developmental delays; and contrary to father's contention, the children did not behave well during visits with him. Following visits with father, the children's behaviors escalated when they returned to their placements.

Latasha L. submitted a declaration in support of the children's opposition to father's petition. Latasha said that father was not able to handle the children during his two hour visits—to the contrary, Davion would sit quietly only if father allowed him to use his phone, and Amor would often run away, requiring the social workers to intervene to keep her safe. There "[is] also hitting among the children which father seems helpless

12

to handle."  And, while Davion seemed to enjoy the visits with father, he did not ask for father between visits.  Latasha stated that she had given father her phone number so he could call and speak to Davion and request visits, but father made minimal use of the opportunity to call Davion.  Latasha never restricted father from speaking to Davion or allowed only 30 second calls.

DCFS noted that father said he had completed a program addressing toddler and preschool aged children with autism, but the children "are now 7 and 8 [years old] . . . .  It is not clear how a course addressing the needs of children under the age of 4 would be helpful to father with these children."  DCFS further asserted that father had told the social worker that he did not believe any of the children had special needs and that he would eliminate all services if he were permitted to do so.  He made similar statements to the L.'s, saying that if he regained custody of his children, he would "remove all services from Regional Center to medication support."  DCFS opined:  "While it is of huge concern for the Department that the father is in denial of the children requiring extra support and services, given the extensive reports and assessments that do reflect there to be some developmental delay, it is of bigger concern for the children's safety and development.  It would only cause regression and result in further delays, which already is a tremendous struggle for both children . . . ."

DCFS noted that Davion recently had begun wearing prescription glasses and was self-conscious about them.  During a visit, father asked Davion why he was wearing glasses and whether he was wearing them because he wanted attention.  Father then took the glasses and said, " 'nah, you don't need them.' "  Davion subsequently asked Ms. L. if she could be at his

13

next visit with father because he did not want father " 'making fun of his glasses.' "

Father was linked to Parents in Partnership (PIP), a program that assists parents who have lost custody of their children, but he completed only the orientation. PIP expressed concerns about father's unwillingness to stop smoking marijuana and his pattern "of requesting 'help' to try and reunify, but when told specifically what to do[,] step by step, [father] would not follow through." Father said it was difficult to stop using marijuana because "he frequently is tempted by friends who engage and offer the substance to father."

Regarding visitation, father was told that visits could be monitored by great-aunt LaShonda M., but he continued to wait for DCFS to schedule visits and to arrange for a monitor and transportation. Further, the children consistently acted out during visits with father, "[w]hich is why DCFS at a minimum requires 2 DCFS monitors to facilitate visits."

Regarding father's attempts to contact the children, DCFS said father's representations were false. To the contrary, "[c]aregivers invited [father] to their home in Los Angeles, with hopes that [father] would be able to engage with Davion more, but that did not happen. They both provided their personal numbers. Mrs. L has provided CSW with screenshots of the father's gaps in responses. The father would also say he planned to send money to [Davion] or tell [Davion] he would return or call him—but not follow through. . . . . [Davion] would ask 'why doesn't he call? He said he would.' "

DCFS also said that father's accusation that Mr. L. smoked marijuana around the children was not true. Father was around the L.'s only during visits, when social workers were also present.

The social workers never suspected Mr. L. of smoking marijuana, but did suspect father of being under the influence "due to his eyes often observed being red and glossy."

DCFS concluded: "[T]he children have expressed no interest in returning to the custody of [father]. Both children are content with their current placement[s], and are content with the connection and bond they have since built with their respective caregivers. The Department feels it would be most detrimental to the children's well-being in having further detachment trauma, and again needing to re-adjust. In addition, . . . father still does not have stable housing, which has been a consistent pattern for years . . . ."

### B. Hearing.

The court held a hearing on father's petition on September 18, 2024. Father testified that he had participated in a three-month outpatient drug rehabilitation program and had been sober for about six months. He had completed parenting classes through Project Fatherhood and Shields for Families, which helped him understand his role as a parent. Housing had been located for him and he was waiting to move in. He was employed and believed he could support his children if they were released to him.

Father testified that both children had special needs. He said Davion had autism, which affected his focus and attention, and Amor had behavioral issues and difficulty focusing. During visits, Amor had difficulty listening if she got excited, and if she got frustrated, "at times it will be hard for her to calm down and kind of regroup herself." Recent visits had been going well, however, and the monitors rarely needed to intervene. Father was aware that Davion was taking medication and he was

15

supportive of continuing both children's current treatment. Father said he read with both children at visits, and he denied telling Davion that he did not need glasses.

Father said he had tried to call both children at their placements, but he rarely was able to speak to them. He conceded that he had never attended either child's medical appointments or school-related appointments. He had not recently attended a 12-step meeting, and he could not identify his sobriety date.

Father's counsel argued that father was sober, had completed a drug rehabilitation program, was employed, and had regularly visited the children. He asked that father be granted an additional six months of reunification services to allow him to demonstrate his commitment to reunifying.

Counsel for DCFS and for the children asked the court to deny father's petition. Counsel noted that the children had been out of father's care since 2018, and his reunification services had been terminated in 2020. Father did not have housing for the children, and neither child had asked to live with him. Although father had visited regularly, he had not taken advantage of the opportunities offered him to call the children between visits or to set up additional visits at the caregivers' homes.

The court concluded that father had not demonstrated sufficiently changed circumstances to warrant a change of order. Although father was now acknowledging the children's special needs, he had never helped them access services or visited consistently. Father still struggled to manage the children, and he had made comments to Davion that were belittling and upset him. Further, while the children had affection for their father, they did not seem bonded to him. The children needed stability

and permanency, and they had found placements that offered that. So, "at this time, the court is finding that the father has not shown changed circumstances. He's struggling. He says he has completed a drug treatment program and that he's been sober for six months. He does not know his sobriety date . . . [a]nd there was no mention as to whether he has a sponsor or what stage he's in in the AA meetings. [H]e has shown, at best, changing circumstances. [¶] I am wholly adopting the argument made by [children's counsel] . . . in finding that it would not be in the best interest of the children at this . . . late stage in the proceedings, with the children spending the majority of their li[ves] in the dependency system, . . . to grant father's 388. So I am respectfully denying father's section 388."

After hearing further argument, the court terminated parental rights as to Amor, finding that she was adoptable, father had not demonstrated a beneficial parental-child relationship, and any benefit to Amor from continuing the parent-child relationship was outweighed by the benefits to her of adoption. The court designated Amor's caregiver the prospective adoptive parent, and it set a section 366.26 hearing for Davion for January 2025.

Father timely appealed from the order denying his section 388 petition and terminating parental rights to Amor.

17

**DISCUSSION**

Father contends on appeal that the trial court erred by denying his section 388 petition and terminating parental rights.[3] For the reasons that follow, father's contention lacks merit.

## I. Legal standards.

Section 388 permits a parent to petition the juvenile court to modify any order based on changed circumstances or new evidence. "Section 388 provides the 'escape mechanism' that . . . must be built into the process to allow the court to consider new information." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; see also *In re Zacharia D.* (1993) 6 Cal.4th 435, 447.) To obtain the requested modification, the parent must demonstrate by a preponderance of the evidence both a change of circumstance and that the proposed change of order is in the child's best interests. (§ 388; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) "That is, '[i]t is not enough for [the petitioner] to show just a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child. [Citation.]' (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529." (*In re Mickel O.*, at p. 615.)

The change in circumstance must be such that the problem that brought the child into the dependency system has been removed or ameliorated; the change must therefore be significant

---

[3] Father's sole contention with regard to termination of parental rights is that his rights should not have been terminated because the juvenile court should have granted his section 388 petition. We thus do not separately address the order terminating parental rights.

18

or substantial. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 615.) Circumstances must have changed and not be merely changing. (*Ibid.*) To determine whether this showing has been made, the court may consider the entire factual and procedural history of the case. (*Id.* at p. 616.) "The court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. [Citation.] In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.' " (*Ibid.*)

Whether to modify an order under section 388 rests in the juvenile court's discretion and will not be disturbed on appeal unless there has been a clear abuse of discretion. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616.) A trial court abuses its discretion if it applies the wrong legal standard, makes factual findings not supported by substantial evidence, or its decision is capricious or arbitrary. (*In re R.F.* (2023) 94 Cal.App.5th 718, 728; *In re D.P.* (2023) 92 Cal.App.5th 1282, 1291.)

## II.  Analysis.

Father contends the trial court erred by denying his section 388 petition because there was substantial evidence that his circumstances had changed and that a change of order was in the children's best interests. In so urging, father misapprehends the standard of review. When the juvenile court has concluded that the party with the burden of proof did not carry the burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the

19

appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; see also *In re M.V.* (2025) 109 Cal.App.5th 486, 508.)

Applying this standard in the present case, father's appeal necessarily fails. Although father points to some evidence of changed circumstances, he makes *no* showing that substantial evidence did not support the juvenile court's contrary finding. Thus, father has failed to make the showing necessary to support reversal.

Moreover, having independently reviewed the record, we conclude that substantial evidence supports the juvenile court's order. Father had a long history of drug use and had not submitted to drug tests through DCFS for many years. He admitted continuing to smoke marijuana as recently as March 2024, and while he said that he had stopped using marijuana in April 2024, he did not submit any clean drug tests. There also was no evidence that he was participating in any drug recovery aftercare, and his most recent attendance at a 12-step program appeared to be in June 2022. Accordingly, the juvenile court reasonably could have concluded that father was still struggling with sobriety. Further, while father had regular monthly (or twice monthly) two-hour visits with his children, he did not schedule or obtain monitors for the visits, and he struggled to manage the children's challenging behaviors without significant assistance. In short, there was substantial evidence to support the juvenile court's conclusion that father had not

significantly ameliorated the problems that brought his children into the dependency system.

There also was substantial evidence to support the juvenile court's conclusion that a change of order was not in the children's best interests. After multiple placements, Amor, a child with significant special needs, was in a stable placement with a caregiver who wished to adopt her. Davion, who also had significant special needs, was also in a stable placement with caregivers who planned to adopt J.J. and who were open to adopting Davion as well. In short, both children were doing well with adults to whom they had bonded and who were both committed and equipped to meet their needs. In contrast, father did not demonstrate that he had secured housing for his children, fully educated himself about their special needs, or was prepared to continue to access services to meet those needs. Accordingly, the trial court's order denying father's section 388 petition manifestly was not an abuse of discretion.

## DISPOSITION

The orders denying father's section 388 petition and terminating parental rights to Amor are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.

We concur:


EGERTON, J.


GAAB, J.*

---

\*      Judge of the Fresno County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.